UNITED STATES OF AMERICA
DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD D. FETTY JR.

    Plaintiff

v.

HOFFMANN MARINE
HOFFMANN STAR LINE LLC
MACKINAC ISLAND FERRY CO.
CHRISTOPHER B. SHEPLER
JENNY GEZELLA

    Defendants
_____/

Case No. 2:24-cv-148

Hon:

Attorney for Plaintiff:
ROUMEL LAW
Nicholas Roumel (P37056)
4101 Thornoaks Dr.
Ann Arbor MI  48104
*nick@roumel-law.com*

.

# COMPLAINT AND JURY DEMAND

Plaintiff makes his complaint as follows:

### PARTIES/JURISDICTION/VENUE

1. Plaintiff Gerald D. "Jerry" Fetty Jr. is a resident of Cheboygan, Michigan, in the Western District of Michigan.

2. Defendant Hoffmann Marine ("Hoffmann") is a division of the Hoffmann Family of Companies, based at 550 Port-O-Call Way, Naples, FL 34102. Its President is Defendant Jenny Gezella.

3. Defendant Hoffmann Star Line LLC ("Star Line") is a Michigan Domestic Limited Liability Company registered with the State of Michigan as of May 13, 2024. Its resident agent is Incorp Services, Inc., 40600 Ann Arbor Rd. East, Ste. 200, Plymouth MI 48170. It is a division of Hoffmann Marine. Hereafter, unless otherwise specified, "Hoffmann" shall refer to Hoffmann Marine and Star Line, collectively.

4. Defendant Mackinac Island Ferry Co. ("MIFC") is a Michigan Domestic Profit Corporation registered with the State of Michigan. Its Resident Agent, as of the date of the filing of this lawsuit, was and remains Plaintiff Gerald Fetty, 587 North State St., St. Ignace, MI, 49781, despite the ostensible sale of MIFC to Hoffmann on June 26, 2024.

5. Christopher B. Shepler is the President and Resident Agent of Shepler's St. Ignace, Inc., 556 Central Ave., Mackinaw City MI 49701, d/b/a Shepler's Mackinac Island Ferry ("Shepler's").

6. The events giving rise to this lawsuit primarily occurred in and around Mackinac County (where Mackinac Island is located, including St. Ignace to the north), and Cheboygan County to the south. All are located in the Western District of Michigan.

7. The claims in this case arise under common law. Jurisdiction is proper under the diversity jurisdiction provisions of 28 USC § 1332 (a), as parties are residents of different states, and the amount in controversy exceeds $75,000.

8. Venue is proper in the Western District of Michigan per 28 USC § 1391 (b) (1) and (2), as the cause of action arose there.

## FACTUAL ALLEGATIONS

**Hoffmann Acquires both Shepler's and the Mackinac Island Ferry Company**

9. For many years, MIFC and Shepler's operated competing ferry lines to Mackinac Island, which is a popular tourist destination, especially during the summer months, and primarily reachable only by ferry.

10. In 2022, Hoffmann purchased Shepler's. Its former owner, Christopher Shepler, remains as its President and CEO.

11. Hoffmann also owns Sip n' Sail Cruises on Mackinac Island, as well as two local newspapers, the *Mackinac Island Town Crier* and the *St. Ignace News*, as well as significant parcels of property in the area of Mackinaw City and St. Ignace.

12. Given the above, Hoffmann became well familiar with the local landscape, the dynamics of Mackinac Island tourism, and the island ferry system.

13. MIFC and Shepler's were operating side by side, in the same water routes, using the same docks, with the same local residents and businesses who interacted daily with the two ferry lines.

14. In 2024, Hoffmann became interested in also purchasing MIFC, which would give them a virtual monopoly of transporting the estimated million-plus visitors to Mackinac Island every year.

15. Prior to the purchase, Hoffmann – a private equity firm with over 110 global brands and more than 11,000 employees across more than 250 locations in 30 countries, with over $3 billion dollars of annual revenue, owned by one of the richest people in the world – had ample opportunity to conduct thorough due diligence.

16. As one might expect of a multi-billion dollar "family of companies" that specializes in buying smaller companies, Hoffmann has a team of highly experienced professionals who know how to do their homework before completing a sale.

17. With regard to the purchase of the MIFC, a modest local company with about a dozen boats and 200 employees, it would not have been especially complicated for Hoffmann to thoroughly conduct its homework before making the purchase.

18. Specifically, Hoffmann had ample opportunity to inspect MIFC's fleet, docks, and personnel; examine the books and records of MIFC, review government records ranging from local government to the U.S. Coast Guard, talk to locals, and otherwise leave no stone unturned when it came to deciding to purchase MIFC.

19. Mr. Fetty was fully cooperative in granting Hoffmann such access.

20. Indeed, after performing its due diligence, Hoffmann became aware of certain issues such as equipment problems in MIFC's boats, which would be entirely expected given the age of the fleet and the normal use to which they were put.

21. Nonetheless, eager to consummate the sale, which made Hoffmann the largest real estate owner in the area as well as giving them a monopoly of the transportation service to and from Mackinac Island, Hoffmann pushed forward with the purchase of MIFC.

22. The sale was finalized on June 26, 2024, with the newly formed Hoffmann Star Line LLC (a Michigan division of Hoffmann's Marine) as purchaser, other Hoffmann divisions as intermediaries, and Plaintiff Jerry Fetty as the representative of the shareholders of the MIFC.

23. Indeed, as a condition of that sale, Hoffmann expressly warranted that it had:

> "… conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Principal Sellers and the Company for such purpose."

**Jerry Fetty Remained as MIFC's CEO After the Sale**

24. After the sale, Mr. Fetty remained CEO of the MIFC.

25. His employment as CEO was pursuant to an Employment Agreement dated December 1, 2022, entered into between the MIFC and Mr. Fetty, and signed by the MIFC's chairman Kenneth L. Karsten, and Mr. Fetty.

26. Pursuant to that Agreement, Mr. Fetty could be terminated involuntarily for certain "cause," or without cause, as follows:

> **5.1** The Employer may terminate this Agreement and Employee's employment for "cause" upon the good faith determination by the Employer that "cause" exists for the termination of the Agreement and the employment relationship. The term "cause" shall mean any of the following:
>
> (i) Any intentional misuse, misappropriation or misapplication by Employee of the Employer's funds, or any other injurious actions to the Employer or Company committed by Employee; or
> (ii) Employee's conviction of a crime involving moral turpitude; or
> (iii) Employee's breach, non-performance or non-observance in any material respect of a material term of this Agreement if such breach, non-performance or non-observance shall continue beyond a period of thirty (30) business days immediately after written notice thereof by the Employer or its agents to the Employee; or
> (iv) Any other action by the Employee involving willful and deliberate malfeasance or gross negligence in the performance of Executive's duties.
>
> **5.2** Employer may terminate this Agreement at any time, by giving prior written notice of thirty (30) days to Employer.

27. If terminated without cause, MIFC would be liable to Mr. Fetty for certain severance under paragraph 8.

28. Hoffmann did not seek to execute a new employment agreement with Mr. Fetty after purchasing MIFC.

**Hoffmann Purported to Terminate Fetty**

29. On July 17, 2024, just three weeks after purchasing MIFC, Hoffmann announced Mr. Fetty's termination:



6

30. At no time prior to this announcement did Hoffmann provide thirty days' notice to Mr. Fetty as required by the agreement for termination without cause under 5.2, or certain termination for cause under 5.1 (iii).

31. At no time prior to this announcement did Hoffmann advise Mr. Fetty of any other significant injurious actions, willful and deliberate malfeasance, or gross negligence, or any other significant deficiencies of duties, before terminating his employment just weeks after their purchase of MIFC.

32. Indeed, at the time it purported to terminate Mr. Fetty (and to the present), the MIFC continues to list Mr. Fetty on the State of Michigan's corporate website as its resident agent and president, with other officers remaining listed as they were before the sale to Hoffmann:

**The name and address of the Resident Agent:**

| | |
|---|---|
| Resident Agent Name: | GERALD D. FETTY, JR. |
| Street Address: | 587 NORTH STATE STREET |
| Apt/Suite/Other: | |
| City: | ST. IGNACE   State: MI   Zip Code: 49781 |

**Registered Office Mailing address:**

| | |
|---|---|
| P.O. Box or Street Address: | 587 N STATE ST |
| Apt/Suite/Other: | |
| City: | SAINT IGNACE   State: MI   Zip Code: 49781-1428 |

**The Officers and Directors of the Corporation:**

| Title | Name | Address |
|---|---|---|
| PRESIDENT | GERALD FETTY, JR. | 587 N. STATE STREET ST. IGNACE, MI 49781 USA |
| TREASURER | MADIGAN | 587 N. STATE STREET ST. IGNACE, MI 49781 USA |
| SECRETARY | DAVID RAMSAY | 587 N. STATE STREET ST. IGNACE, MI 49781 USA |
| DIRECTOR | KENNETH KARSTEN | 587 N. STATE STREET ST. IGNACE, MI 49781 USA |

[accessed 8/30/2024, *cofs.lara.state.mi.us*]

33. Furthermore, although the filing with the State of Michigan shows that the MIFC was "merged with the MIFC Merger Corporation" on 6/28/24, the MIFC Merger Corporation was only formed as a pass-through for the sale of MIFC to Hoffmann.

7

34. The MIFC Merger Corporation, with Gregory Hoffmann (one of the CEO's of the Hoffmann Family of Companies) as President, was formed on June 7, 2024, and was merged with and into MIFC effective 11:59 PM on June 28, 2024, leaving MIFC as the surviving corporation of the merger.

35. Accordingly, when Hoffmann purported to terminate Mr. Fetty, it was not accomplished by any valid representative of the MIFC – neither its President, Jerry Fetty, nor its Chairperson, Kenneth Karsten – and the termination is thus of no legal force or effect.

36. Mr. Fetty was replaced with Chris Shepler, his former competitor, who now runs both ferry operations for Mackinac Island.

37. Despite previously pledging that both Shepler's and MIFC would be operated as "two separate companies," around the same time it terminated Mr. Fetty, Hoffmann pulled all of MIFC's hydro-jet ferries (about six boats) from service, leaving Shepler's as the only ferry company in operation during the peak summer tourism months.

**Defendants Have Defamed Plaintiff Since His Termination**

38. For whatever reason, whether to deny Mr. Fetty his severance, to tarnish his reputation, to ingratiate itself as a blameless corporate benefactor to the Mackinac Island and surrounding community, Defendants have determined to defame Mr. Fetty in various media.

39. Chris Shepler was quoted in an MLive article as follows:

> Shepler, whom Hoffmann tapped to lead daily operations there after former CEO Jerry Fetty left his role, said initially every morning was a ritual of seeing what MIFC boats would start and which were safe for the water. By pulling all the fast boats and others off the schedule, Hoffmann was clear that no boats would go back on the water until they were 100% ready. The Band-Aid fixes that had been going on under the old company would not continue, Shepler said.
> [*Mackinac Island Ferry Company's new owner asks to suspend summer, fall service amid huge repair issues*, MLive August 12, 2023, https://www.mlive.com/news/2024/08/mackinac-island-ferry-companys-new-owner-asks-to-suspend-summer-fall-service-amid-huge-repair-issues.html]

40. Hoffmann Marine's president, Jenny Gezella, also appeared to express surprise that MIFC's boats needed repairs:

> When Florida-based Hoffman Marine purchased the Mackinac Island Ferry Co. and its Star Line jets in late June, the company knew there would be maintenance to address among the fleet. What it didn't expect was repairs to the tune of $4 million.
>
> "It became an issue of boats going down constantly, but not with little repairs," said Jenny Gezella, president of Hoffmann Marine. "Like major, major repairs that would make the boats unsafe to operate."

[Detroit News August 18, 2024, , "Then there was one: Company's ownership of both Mackinac ferry lines raises concerns," https://www.detroitnews.com/story/business/2024/08/18/mackinac-island-ferry-lines-single-ownership-raises-questions/74802893007/ ]

41. Similarly, Shepler stated there were "much needed repairs to the MIFC Main Dock on Mackinac Island. Of the 1,000+ pilings supporting that structure, more than 900 of them have to be restored. This will take a new set of engineering drawings, underwater divers and more planning. Shepler said it's a priority, but no timetable has been set. He promised to keep in touch with island officials on this project." [MLive, Id.]

9

42. Shepler also stated that "MIFC had been sued by the state for its "tank farm" setups and Hoffmann officials are now working to rectify a situation that has more than 30 500-gallon drums of stored bilge waste from the ferries at sites in St. Ignace and Mackinaw City. Hoffmann is taking on the cleanup costs." [MLive, Id.]

43. Gezella falsely claimed that "the majority of the issues happened after the surveys [inspections] were conducted." [Detroit News. Id.]

44. Both Shepler's and Gezella's statements indicate surprise, and implicate Mr. Fetty for having neglected and concealed repair issues, when the reality is that Hoffmann had full access to the MIFC fleet, docks, and bilgewater operations before purchase for unfettered inspections as part of its due diligence, and was fully aware of the condition of the fleet and docks before moving forward with the sale.

45. Moreover, MIFC under Mr. Fetty's control spent over a million dollars in the past year constantly updating and repairing its fleet, which was always under U.S. Coast Guard inspection and approval, and its infrastructure.

46. However, on information and belief, after Mr. Fetty was terminated, Hoffmann deferred all planned maintenance and repair so as to deliberately ensure that the fleet would not pass muster with the Coast Guard, and shut down MIFC operations, so that the Defendants could run solely with Shepler's fleet, and falsely implicate Mr. Fetty for the repair issues.

47. Based on these allegations of suddenly discovered repair issues, Hoffmann asked the Mackinac City Council to allow it to suspend MIFC's passenger service and allow it to run only Shepler's ferries for the remainder of the season. [Detroit News, Id.]

48. The media drumbeat of Shepler's and Gezella's false implications that Mr. Fetty's neglected or concealed repair issues has affected the public; see, e.g., multiple negative comments in social media such as facebook.com/groups/mackinacferrylogs, a group with 3,500 members.

## LEGAL ALLEGATIONS

### Count I: Wrongful Termination (Defendants Hoffmann)

49. Defendant Hoffmann purported to terminate Plaintiff from his position as CEO of MIFC.

50. Hoffmann had no authority to terminate Plaintiff under the employment agreement existing between MIFC and Plaintiff.

51. Unless and until Plaintiff is terminated by the proper entity, he remains the CEO of MIFC and has been wrongfully removed from his position and deprived of his compensation.

52. Plaintiff is damaged as set forth herein and below.

### Count II: Breach of Contract (Defendants Hoffmann and MIFC)

53. In the alternative, to any extent Defendants Hoffmann and/or whatever remained of the entity MIFC had the right to terminate Plaintiff's employment, they breached the Employment Agreement by doing so.

54. These defendants failed to provide any notice of breach, nor did they provide 30 days' notice for termination not for cause.

55. Defendants' public announcement of the termination cited no reasons, merely thanking Plaintiff for his service and wishing him well.

56. Hoffmann even released Mr. Fetty from liability as a condition of the sale, with the sales agreement stating in relevant part:

> Purchaser … hereby irrevocably and unconditionally waives, releases and forever discharges each Seller and each Seller's respective Affiliates, equityholders, partners, managers, trustees, employees, directors, managers, officers, and agents or other representatives and their respective Affiliates, heirs, executors, administrators, trustees, successors and assigns (each a "**Seller Released Party**" and collectively the "**Seller Released Parties**") from any and all rights, claims, debts, Liabilities, causes of action, obligations and Losses of any nature or kind, whether known or unknown, matured or contingent, accrued or unaccrued, liquidated or unliquidated or due or to become due, whether for compensatory, special, consequential, incidental or punitive damages or equitable relief, whether based contract or any other basis, and whether arising in Law, in equity or otherwise, based upon facts, circumstances, occurrences or omissions existing, occurring or arising on or prior to the Closing; … [¶ 7.6]

57. Defendants failed to compensate Plaintiff for either the 30-day notice period, or for severance as required by section 8 of the Agreement.

58. The failure to compensate Plaintiff for his notice period and severance also violates the sales agreement, which provides in relevant part that the Purchaser will:

> … provide each Continuing Employee who is terminated during such twelve (12) month period with severance pay that is no less than the severance pay that would have been payable under the applicable severance policy or arrangement in effect for such Continuing Employee immediately prior to the Closing Date had such Continuing Employee terminated employment immediately prior to the Closing Date. [¶ 7.7]

59. The timing and manner of Plaintiff's termination has permitted Defendants to conceal and sandbag their justifications for termination.

60. The public scapegoating of Plaintiff appears to be a clumsy attempt to find fault with Mr. Fetty's exemplary leadership of MIFC over his many years at the helm, to justify not only the termination of his employment and deprive him of his severance, but to divert public attention from the fact that Hoffmann has placed Plaintiff's long-time competitor, Chris Shepler, at the helm of MIFC.

61. Having Shepler run both Shepler's and MIFC severs the last shred of competition between the ferry companies and secures the monopoly that Hoffmann has become, with the greatest share of real estate in the area, virtually all access to and from Mackinac Island, and two local newspapers.

62. Defendants' breach of the Employment Agreement has damaged Plaintiff as set forth herein and below.

## Count III: False Light Defamation

63. Defendants Hoffmann, Chris Shepler, and Jenny Gezella broadcast to the public in general information that was unreasonable and highly objectionable as it attributed to Jerry Fetty characteristics and conduct that were false and placed the Plaintiff in a false position.

64. These Defendants knew, or should have known, that the Hoffmann Family of Companies, as highly skilled specialists in acquiring companies all over the world, had performed meticulous due diligence before purchasing MIFC, and were fully aware of the conditions of the assets they were purchasing, and the legal and compliance standing of MIFC.

65. These defendants have falsely, and maliciously, attributed to Jerry Fetty the clear implication that he and his comparatively tiny company had successfully pulled the wool over the eyes of a world-wide, multi-billion mega corporation that specializes in acquiring companies, even after they had performed their due diligence before acquiring MIFC.

66. These defendants have falsely, and maliciously, implicated Jerry Fetty in lying, concealing information, and selling damaged goods to Hoffmann without Hoffmann's knowledge.

67. These defendants knew, or should have known, that their public statements were false. They knew the truth, or recklessly disregarded the truth, in order to paint a false public narrative of Jerry Fetty's actions prior to the sale.

68. These defendants acted with actual malice, in order to accomplish their objectives of terminating Mr. Fetty's employment, securing a monopoly in ferry service, depriving Mr. Fetty of his severance, and casting themselves as the "white knights" in the eyes of the public.

69. In so acting, these defendants have concealed, or misrepresented, the private nature of the detailed sales transaction between Hoffmann and MIFC, which would fully demonstrate the ample opportunity that Hoffmann would have had to conduct meticulous due diligence before its purchase of MIFC.

70. Defendants' false light defamation, and/or false light invasion of privacy, has damaged Plaintiff as alleged herein and below.

## DAMAGES

71. Defendant's actions were done maliciously, willfully, and with reckless indifference to Plaintiff's rights, and the truth of the transaction between the parties.

72. Defendant's actions directly caused and proximately caused Plaintiff the following damages:

      a. *economic damages*: including but not limited to past and future lost wages; lost fringe benefits such as various types of insurance, retirement, bonuses, pay raises, training and promotions; lost severance benefits in accordance with the Employment Agreement, and consequential damages as may be proven.

      b. *non-economic damages*: including but not limited to embarrassment, humiliation, outrage, pain and suffering, harm to reputation, mental and emotional distress; exemplary damages to the extent allowed by law; and punitive damages as may be allowed by law.

## Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

## Relief Requested

**W H E R E F O R E**   Jerry Fetty requests this honorable court grant him the following as permitted by law and equity:

    a.    Contractual, incidental, and consequential damages;

    b.    Compensatory damages;

    c.    Punitive damages;

    d.    Equitable and/or injunctive relief;

    e.    compensable costs, interest, and reasonable attorney fees;

    f.    any other relief as permitted under the law to vindicate his rights.

              Respectfully submitted,
              Attorney for Jerry Fetty

              **ROUMEL LAW**

              */s/ Nicholas Roumel*

August 30, 2024              Nicholas Roumel, Attorney